DONNA NORMAND & others[1] vs. DIRECTOR OF THE OFFICE OF MEDICAID.

No. 09-P-702.

Suffolk. December 17, 2009. - September 10, 2010.

Present: LENK, DUFFLY, & McHUGH, JJ.

*Medicaid. Public Welfare,* Medical assistance benefits. *Annuity. MassHealth.*

Nothing in the records of administrative appeals brought in Superior Court by plaintiffs challenging the denials by the Commonwealth's office of medicaid (office) of their applications for benefits suggested impropriety or inconsistency in the office's use of a certain life expectancy table to value annuities purchased by the plaintiffs [640]; however, where the records demonstrated that the administrative hearing officer failed to make any findings with regard to the plaintiffs' intent in obtaining the annuities, thus ignoring statutory and regulatory provisions designed for their benefit, fundamental justice required that the matters be remanded for consideration and disposition of that issue [641-644].

CIVIL ACTIONS commenced in the Superior Court Department on December 13, 2007, February 15, 2008, and March 24, 2008.

After consolidation, the case was heard by *Geraldine S. Hines,* J., on motions for judgment on the pleadings.

*John J. Ford (Paul E. Thornhill* with him) for the plaintiffs.

*David R. Marks,* Assistant Attorney General, for the defendant.

McHUGH, J. Three consolidated appeals question the method used by the Commonwealth's office of medicaid to value annuities purchased by applicants for benefits provided by Mass-Health, the name given to Medicaid assistance in Massachusetts. In all three cases, MassHealth valued the annuities at less than they cost. As a consequence of that valuation, the appellants, two of whom had purchased the annuities and one of whom was the spouse of a purchaser, were temporarily disqualified from receiv-

[1] Grace Kelly and Thomas McCormick.

ing MassHealth benefits for reasons that will be described as we proceed.

In all three cases, the plaintiffs took an administrative appeal from MassHealth's denial of benefits, and in all three, the decision was upheld. Then followed appeals to the Superior Court pursuant to G. L. c. 30A, where the three cases were consolidated. After hearing, judgments entered affirming the administrative decisions. From those judgments, the plaintiffs appeal. For the reasons that follow, we vacate the judgments and remand the cases for further administrative proceedings.

*Facts.* Donna Normand, one of the appellants, is a resident of a nursing home in Boston. The administrative record in her case shows that she purchased an annuity from Aviva Life Insurance Company (Aviva) on April 18, 2007, when she was eighty-five years, eight months of age. According to a table Aviva used in connection with its annuity sales, a woman of Normand's age had a life expectancy of eight years, four months.[2] Normand paid Aviva $39,000 for the annuity, which yielded monthly payments of $398.24 for a guaranteed period of eight years, four months. Those payments totaled $39,824, an amount that was slightly more than the premium Normand paid. Normand designated the Commonwealth of Massachusetts as the beneficiary to whom payments would go if she died before the end of the guarantee period.

The life expectancy table on which Aviva relied when it sold the annuity to Normand was last updated in 2000, some seven years before the sale. The Social Security Administration (SSA) also maintains and publishes a life expectancy table. That table, which was updated as of July 9, 2007, showed that the life expectancy of an eighty-five year old female was 6.43 years. Multiplying that shorter life expectancy by the amount of the monthly payment provided by the annuity meant that, before her anticipated death, an eighty-five year old female would receive only $30,728, $8,272 less than the $39,000 Normand had paid.

The difference between what Normand paid for the annuity

---

[2]That was not necessarily Normand's life expectancy, see generally, e.g., Allen, A Reconceptualization of Civil Trials, 66 B.U. L. Rev. 401, 411-415 (1986), but general life expectancy tables are customarily used in the sale of annuities.

and the total amount the annuity could be expected to yield during the life of a woman her age has implications for MassHealth eligibility that lie at the heart of this appeal. MassHealth, the Massachusetts Medicaid program, is a joint State and Federal program designed to pay the cost of medical care for those who are otherwise unable to afford it. See G. L. c. 118E, § 9, inserted by St. 1993, c. 161, § 17; *Haley* v. *Commissioner of Pub. Welfare*, 394 Mass. 466, 467 (1985).

In order to qualify for a MassHealth contribution toward nursing home expenses, an individual must, among other things, have $2,000 or less in "countable" assets.[3] 130 Code Mass. Regs. § 519.006 (2006).[4] To prevent asset transfers designed solely to allow the transferor to qualify for MassHealth assistance, regulations provide that, with some exceptions not relevant here, any asset transferred by a nursing home resident or spouse for less than "fair market value" within a defined "look-back" period will be disregarded unless the transfer is specifically permitted by regulation or statute. See 130 Code Mass. Regs. § 520.019. The "look-back" period begins "on the first date the individual is both a nursing-facility resident and has applied for or is receiving MassHealth" assistance and extends back in time for not less than thirty-six months. 130 Code Mass. Regs. § 520.019(B).[5]

Under the regulations, the value of any disregarded transfer remains a "countable asset" of the transferor and makes the transferor temporarily ineligible for MassHealth benefits.[6] The period of ineligibility is determined by dividing the total value of

---

[3]"Countable" assets for long-term care recipients are described in 130 Code Mass. Regs. § 520.016 (2006). Except for portions of the annuity payments involved in these appeals and with one exception described below, see note 11, *infra*, none of the appellants had countable assets in excess of $2,000.

[4]With two exceptions not relevant to any issues argued in this appeal, the State regulations cited became effective February 11, 2006.

[5]Thirty-six months was the look-back period for all transfers that occurred before February 8, 2006. Beginning that month, however, the period was gradually extended to what will be a sixty-month look-back period by February 8, 2011. *Id.* There is no question that all three annuity purchases involved in this case occurred during the look-back period.

[6]More precisely, ineligibility occurs to the extent that the disregarded transfer pushes the transferor's "countable assets" over $2,000. None of the three cases now before us considered the relationship between the value of the disregarded transfer and the $2,000 MassHealth limitation. Instead, with one exception, see note 11, *infra*, all parties treated the disregarded transfer in isolation. Consequently, we do likewise.

the disqualified transfer by the average daily cost of nursing home services provided to private patients receiving those services in Massachusetts. 130 Code Mass. Regs. § 520.019(G)(1). All parties agree that the average daily cost applicable to these cases is $256.[7]

Insofar as annuities purchased during the look-back period are concerned, the applicable statute, 42 U.S.C. § 1396p(c)(1) (G)(ii)(II),[8] provides, in pertinent part, that the premium paid for the annuity is a disqualified asset transfer unless the annuity "is actuarially sound (as determined in accordance with actuarial publications of the Office of the Chief Actuary of the Social Security Administration)."

Implementing that statute is 130 Code Mass. Regs. § 520.007 (J)(1)(b), which explains the concept of "actuarial soundness" by providing that purchase of an annuity is a disqualifying transfer

> "when the beneficiary is the applicant . . . or spouse and when the total present value of projected payments from the annuity is less than the value of the transferred asset (purchase price). In this case, the MassHealth agency determines the amount of the disqualifying transfer based on the actuarial value of the annuity compared to the beneficiary's life-expectancy using the life-expectancy tables as determined by the MassHealth agency, giving due weight to the life-expectancy tables of institutions in the business of providing annuities."

In other words, the premium paid for an annuity is a disqualifying transfer to the extent that the projected yield to the purchaser during his or her anticipated lifetime is less than the premium itself.[9]

---

[7]Title 130 Code Mass. Regs. § 520.019(G)(1) contains a formula for calculating a monthly period of disqualification using the average monthly cost of private nursing home services. In all three of these cases, however, the parties used the average daily cost of services to determine the length in days of MassHealth ineligibility.

[8]Because MassHealth is a joint Federal and State program, the Massachusetts statutes and regulations governing the program must be consistent with the requirements of Federal law. See *Youville Hosp.* v. *Commonwealth*, 416 Mass. 142, 146-147 (1993); *Atlanticare Med. Center* v. *Commissioner of the Div. of Med. Assistance*, 439 Mass. 1, 3-4 (2003).

[9]The parties implicitly agree that both the actuarial soundness of the annuity

Based on that approach to a disqualifying transfer, MassHealth determined that Normand was ineligible for receipt of Mass-Health benefits for thirty-two days because, using the SSA life expectancy table, the total amount a woman her age could expect to receive from her annuity during her lifetime was $8,271, less than the amount she paid to purchase the annuity. Dividing that difference by $256, the average daily cost of Massachusetts nursing home services, produced the 32-day disqualifying period.

Normand took an administrative appeal from the MassHealth decision, claiming that MassHealth should have used the Aviva life expectancy table when calculating the total amount the annu-

and the "present value" of the projected annuity payments are determined by multiplying the monthly annuity payments by the purchaser's life expectancy. That is not how economists approach the concept of "present value." See, e.g., Butler, Economic Analysis for Lawyers 183-188 (1998). As for actuarial soundness, none of the parties has cited a relevant publication of the Office of the Chief Actuary of the Social Security Administration. The Commonwealth, albeit without citation to authority, states in its brief that "[t]he actuarial soundness of an annuity for a term equal to the annuitant's life expectancy depends on whether payments under the annuity during the life expectancy of the annuitant will at least equal the amount paid for the annuity." That definition of "actuarial soundness" is consistent with the State Medicaid Manual published by the Federal Health Care Financing Administration, the agency "charged with administering the Medicaid program and promulgating *its* implementing regulations." *Rudow* v. *Commissioner of the Div. of Med. Assistance*, 429 Mass. 218, 227 n.14 (1999). In material part, the manual states that

> "[a]nnuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate of the life expectancy of the beneficiary, the annuity can be deemed actuarially sound."

State Medicaid Manual, Health Care Financing Administration Pub. 45-3, Transmittal 64 (Nov. 1994), § 3258.9(B), available at http://www.cms.gov/ Manuals/PBM/list.asp?listpage2 (last visited Aug. 31, 2010). See generally *Atlanticare Med. Center, supra* at 9 n.12. Several cases also base "actuarial soundness" on the yield to the recipient during his or her anticipated lifetime. See *Johnson* v. *Guhl*, 91 F. Supp. 2d 754, 763 (D.N.J. 2000); *Mertz* v. *Houstoun*, 155 F. Supp. 2d 415, 419 (E.D. Pa. 2001). Our analysis utilizes the approach to "present value" and "actuarial soundness" the parties have adopted.

ity would yield during her lifetime. The hearing officer disagreed and affirmed the MassHealth decision. Insofar as use of the SSA life expectancy table is concerned, the hearing officer found

> "that MassHealth has given due weight to the life-expectancy table of Aviva as well as other institutions in the business of providing annuities, and concluded that it was outdated and not as accurate an indication of the life expectancy as the SSA table projects. MassHealth has proffered a reasonable and thoughtful explanation for why the Aviva table was rejected and not considered as accurate or appropriate in calculating life expectancy in this case. I therefore find that MassHealth complied with the requirement of 130 CMR 520.007(J)(1)(b) and gave due weight to the Aviva table, as well as in reaching its conclusion that the SSA table was the more appropriate of the two to be used."

Normand then appealed to the Superior Court where a judge, in an extensive memorandum of decision, ordered entry of judgment on the pleadings in favor of MassHealth, thereby affirming the administrative decision.

The two other cases involved in this appeal follow a similar pattern. Grace Kelly was eighty-nine years of age when she purchased from Aviva an annuity designed to pay the monthly sum of $1,305.82 for a guaranteed period of six years, ten months. The Aviva life expectancy table showed that an eighty-nine year old woman had a life expectancy of 6.48 years. Using the SSA table, however, MassHealth determined that an eighty-nine year old female's life expectancy was 4.79 years. With a life expectancy of 4.79 years, the annuity's lifetime yield was $30,192 less than Kelly's purchase price and, at the rate of $256 per day, resulted in a 118-day disqualification.[10]

Finally, Thomas McCormick entered a nursing home at age eighty-eight. A few months later, his wife, Josephine, who was eighty-six, purchased for $45,000 an annuity that was guaranteed

---

[10]Kelly died on April 28, 2008, about eight months after purchasing the annuity. As in the case of Normand, the Commonwealth was named as the primary beneficiary of her annuity payments and presumably received those payments at monthly intervals, at least until it was reimbursed for the amount MassHealth had expended on Kelly's behalf.

to pay $509.52 per month for seven years, six months. Aviva's table showed that the life expectancy of an eighty-six year old woman was 7.85 years. The SSA table, however, contained a life expectancy of 6.43 years, producing a yield the agency calculated to be $5,685.44 less than the purchase price. As a result, McCormick was disqualified for twenty-two days.[11]

*Discussion.* On this appeal, Normand, Kelly, and McCormick present three basic arguments. First is that the hearing officer and Superior Court judge erred by concluding that, in order to be administratively sound, the annuities had to be based on life expectancy tables promulgated by the SSA, despite the mandate of the governing regulation that MassHealth "giv[e] due weight to the life-expectancy tables of institutions in the business of providing annuities." But in all three cases, the hearing officer found that MassHealth's use of the SSA life expectancy table was proper because MassHealth reasonably concluded that the table was more accurate. Nothing in the administrative decisions or in the Superior Court decision suggests that MassHealth adhered blindly to the SSA tables without considering the weight and value of the tables used by Aviva.

The appellants' second argument is that administrative determinations in appeals from other MassHealth decisions, several of which were included in the administrative record of Kelly's case, allowed use of the Aviva table instead of the SSA table. Different decisions allowing use of different tables, the appellants argue, "will wreak havoc on the right of individuals to purchase annuities and the duty to advise such persons, whether by experienced counsel or the annuity companies." But the fact that different fact finders reached different decisions at different times about the same basic issue does not mean that the fact finders who decided the cases before us were wrong. Moreover, the cataclysm the appellants conjure can be avoided by using for planning purposes the most conservative annuity table in general circulation when determining which annuity to purchase.

---

[11]An additional asset brought McCormick's total disqualification to thirty-two days, but that additional asset and disqualification are irrelevant to the issues these cases involve. In addition, in calculating Josephine's guaranteed payment, the hearing examiner found that Aviva used a slightly lower life expectancy than its own life tables indicated (91.2 months as opposed to 94.2 months) resulting in a slightly lower total yield than the Aviva table warranted. The lower yield likewise plays no role in the issues these cases present.

The appellants' third argument, though, has sharper bite. A portion of the governing statute, 42 U.S.C. § 1396p(c)(2)(C), provides that

> "[a]n individual shall not be ineligible for medical assistance by reason of [an otherwise disqualifying asset transfer] to the extent that . . . a satisfactory showing is made to the State (in accordance with regulations promulgated by the Secretary) that . . . the individual intended to dispose of the assets either at fair market value, or for other valuable consideration."[12]

In Massachusetts, that statute is implemented by 130 Code Mass. Regs. § 520.019(F), the material portions of which provide that

> "the MassHealth agency will not impose a period of ineligibility for transferring resources at less than fair-market value if the nursing-facility resident or the spouse demonstrates to the MassHealth agency's satisfaction that . . . (2) the nursing-facility resident or spouse intended to dispose of the resource at either fair-market value or for other valuable consideration. Valuable consideration is a tangible benefit equal to at least the fair-market value of the transferred resource."[13]

The appellants maintain that the administrative judge failed

---

[12]Neither party has cited any implementing regulations promulgated by the Secretary of Health and Human Services, and our own research has revealed none.

[13]While many approaches to fair market value are theoretically possible, the parties and the hearing officer all proceeded on the premise that, where annuities are concerned, "actuarial soundness," see note 9, *supra*, is the basis for determining fair market value for Medicaid purposes. Their approach is consistent with the approach taken in the State Medicaid Manual, see *ibid.*, which provides as follows:

> "To make [a] determination [of actuarial soundness], use the following life expectancy tables, compiled from information published by the Office of the Actuary of the Social Security Administration. The average number of years of expected life remaining for the individual must coincide with the life of the annuity. If the individual is not reasonably expected to live longer than the guarantee period of the annuity, the individual will not receive fair market value for the annuity based on the projected return. In this case, the annuity is not actuarially sound and a transfer of assets for less than fair market value has taken place,

to make any findings regarding their intent and, thus, ignored statutory and regulatory provisions designed for their benefit. MassHealth counters that appellants waived that claim by failing to raise it at the administrative level and, a fortiori, by failing to introduce any evidence at the administrative level that would support a finding in their favor on the question of intent.

The record shows that the primary focus at the administrative hearing was on which annuity table MassHealth should have used in making the appellants' eligibility determinations. Moreover, none of the papers the appellants filed requested a determination of their intent if the officer determined that they had in fact purchased an annuity for less than fair market value.

At the same time, several components of the brief, uncomplicated administrative records in these cases suggest inferentially, but unmistakably, that a transfer for fair market value was what each of the appellants intended. First of all, the appellants purchased the annuities from Aviva, a company that was in the business of selling annuities. They did not attempt to create some unique annuity program for themselves, did not attempt to effect transfers to family members, and did not otherwise attempt to create a mechanism for shielding assets in order to qualify for MassHealth benefits. Instead, they went into a commercial market and bought a commercial product.

Second, a fact finder could reasonably conclude from the administrative record in each case that the appellants did not intend to make a gift to Aviva of a substantial portion of their limited assets by paying more for the annuities than MassHealth later determined they were worth. The absence of a donative intent, in turn, is some evidence of an intent to purchase for value.

Third, all three annuities had guaranteed payments equal to or slightly in excess of the premium the appellants paid. The MassHealth determination that the premium was in excess of

---

subjecting the individual to a penalty. The penalty is assessed based on a transfer of assets for less than fair market value that is considered to have occurred at the time the annuity was purchased."

We, therefore, proceed on the premise that "fair market value" in the context of valuing annuities for Medicaid purposes is determined by the annuity's "actuarial soundness."

the annuity's fair market value was based on the anticipated return to the appellants themselves, not on the total amount Aviva ultimately would be required to pay. Though perhaps the annuities were no bargain, a fact finder could conclude that nothing in the administrative record showed that Aviva sold these annuities for more than fair market value as that term customarily is used in other contexts.

Finally, as required by the governing Federal statute, two of the three appellants designated MassHealth as the primary beneficiary of their annuity's guaranteed payments in the event that they died before expiration of the guarantee period.[14] Although that designation may be irrelevant to determining whether the annuity was "actuarially sound," see note 9, *supra*, the administrative equation of actuarial soundness and market value is designed to prevent individuals from using annuities to shelter assets. Designation of the Commonwealth as the primary residual beneficiary of the annuity is evidence that sheltering assets was not a factor in the appellants' purchasing decision, making it more likely that an intent to purchase the annuities for fair market value was the primary, if not the exclusive, motivating force.

The prominence of those factors in these straightforward administrative records leads us to reject the defendant's waiver argument, although we recognize that the argument is deeply rooted in ordinary rules of practice and procedure. See, e.g., *Albert* v. *Municipal Ct. of Boston*, 388 Mass. 491, 493 (1983), citing *Shamrock Liquors, Inc.* v. *Alcoholic Bevs. Control Commn.*, 7 Mass. App. Ct. 333, 335 (1979). But

> "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them. A rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to

[14]The governing statute, 42 U.S.C. § 1396p(c)(1)(F), provides that, for Medicaid purposes, "the purchase of an annuity shall be treated as the disposal of an asset for less than fair market value unless — (i) the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual under" the Medicaid program. In Massachusetts, the statute is implemented by 130 Code Mass. Regs. § 520.007(J)(2)(a)(1). The annuity purchased by Josephine McCormick named a family member as a beneficiary.

consider all questions which had not previously been specifically urged would be out of harmony with this policy. Orderly rules of procedure do not require sacrifice of the rules of fundamental justice."

*Hormel* v. *Helvering*, 312 U.S. 552, 557 (1941). Accord *McLeod's Case*, 389 Mass. 431, 434 (1983); *Cruz* v. *Commissioner of Pub. Welfare*, 395 Mass. 107, 111 (1985); *Stop & Shop Supermarket Co.* v. *Loomer*, 65 Mass. App. Ct. 169, 172 (2005).

This is a case where we think fundamental justice requires consideration of the appellants' intent as the governing statute provides. The fact that MassHealth disregarded a portion of the asset transfers did not mean that the disregarded transfers were automatically returned to the appellants or could be called back from relatives and friends. On the contrary, so far as the record shows, the money remained in the hands of Aviva. The appellants' very ability to qualify for MassHealth benefits shows how difficult it likely would be for them to absorb the financial consequences of the miscalculated annuity value. Given that basic health care is at stake, the governing statute and regulations humanely recognize that miscalculations about the value of transferred assets are bound to occur and, in those instances, provide a relief mechanism in which good faith intent is the controlling factor. The statute and regulations are specifically designed for cases like these.

We are not the fact finders and the question of intent is for MassHealth administrators, at least in the first instance. On this record, though, the question requires consideration. Accordingly, we vacate the judgments and direct that new judgments enter in the Superior Court remanding the matters to the office of medicaid for consideration and disposition of the issue of intent, which will then be subject to review in the normal course. See generally *Canter* v. *Commissioner of Pub. Welfare*, 423 Mass. 425, 434-435 (1996).

*So ordered.*